No. 61,185

ARMY NATIONAL BANK and MARYVILLE BANCSHARES, INC., *Appellees,* v. EQUITY DEVELOPERS, INC., a Kansas corporation; GREENBROOK DEVELOPMENT CORPORATION, a Kansas corporation; EQUIBANK CORPORATION, a Kansas corporation; THE BANK OF KANSAS CITY, a Missouri corporation; PIONEER MATERIALS, INC.; THE WALT KEELER CO., INC.; J. STANLEY MINTER, d/b/a MINTER DRYWALL; JAY D. SOOTER and PATRICIA M. SOOTER, d/b/a CONCRETE SYSTEMS; SOOTER EXCAVATING, INC.; ARTISCAPE, INC.; DAVID HALL ROOFING; WICHITA AIR CONDITIONING CO., INC.; STAR LUMBER SUPPLY CO., INC.; L & S SHEET METAL, INC.; KAUFMAN MEEKS, INC., a Texas corporation; ROBERT L. MOELLINGER; REEVES-WIEDEMAN COMPANY, a Kansas corporation; KEITH WIRTHS EXCAVATING CO., INC.; KEN BELL DRYWALL CO., INC., a Kansas corporation; DANNIE R. WIENS CONSTRUCTION CO.; EATON PLUMBING CO., INC., a Kansas corporation; McCULLOUGH EXCAVATION, INC., a Kansas corporation; WICHITA DRYWALL & ACOUSTICAL SUPPLY, INC., a Kansas corporation; TRIPLE R. ROOFING; MID-KANSAS CONSTRUCTION CO., INC., a Kansas corporation; W. B. CARTER CONSTRUCTION COMPANY, INC., a Kansas corporation; THE UNITED STATES OF AMERICA; THE STATE OF KANSAS; KITCHEN DESIGN, INC., a Kansas corporation; BOYD POWELL, d/b/a BOYD POWELL FLOOR COVERING CO.; EMCO INSULATION & SUPPLY CO.; MICHAEL P. ALEXANDER; RONALD D. CUNNINGHAM; and SCHULTE & BOHRER CONSTRUCTION CO., *Appellants.*

(774 P.2d 919)

4

Opinion filed May 26, 1989.

*James C. Mordy*, of Morrison, Hecker, Curtis, Kuder & Parrish, of Kansas City, Missouri, argued the cause, and *Morris J. Nunn* and *Dennis M. Garvis*, of the same firm, *Craig T. Limbocker*, of the same firm, of Wichita, and *E. Whitney Drake*, Special Counsel, Complex Litigation, of Washington, D.C., and *Janine Hassler*, Staff Attorney, of Kansas City, Missouri, were on the briefs for appellant Federal Deposit Insurance Corporation.

*Walter C. Williamson*, of Williamson, McGee, Griggs & DeMoss, Chartered, of Wichita, argued the cause, and *Andrea M. Ramsay*, of the same firm, was with him on the brief for appellant Equibank Corporation.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Donald E. Schrag*, of the same firm, was with him on the brief for appellees Army National Bank and Maryville Bancshares, Inc.

The opinion of the court was delivered by

Six, J.: This case presents a first impression issue involving a mortgagee's transfer and assignment of notes and mortgages as security for its own borrowing. We are requested to establish the appropriate controlling law to be applied in the determination of the relative priorities of competing interests. The issue is centered within the relationship of Article 9 of the Uniform Commercial Code, Kansas real estate recording statutes, the perfection of an Article 9 UCC instrument secured by real estate, and priority to foreclose a real estate mortgage. The parties involved are commercially sophisticated entities.

The defendants, Equibank Corporation (Equibank) and Federal Deposit Insurance Corporation (FDIC), appeal from the trial court's judgment holding that Army National Bank (Army) and its assignee, Maryville Bancshares, Inc., had a superior interest in the proceeds of the foreclosure of mortgages on the "Greenbrook project" in Wichita, Kansas. Army's and Maryville Bancshares' interest arose out of Army's participation in loans made by Equibank to the developers of Greenbrook and a subsequent subordination agreement between Army and Equibank. The FDIC was substituted as the real party in interest in place of the Bank of Kansas City (BOKC) by order of the district court. BOKC

was a credit lender of Equibank. Equibank assigned and gave possession of nine promissory notes by Equity Developers Inc., (EDI) the developers of Greenbrook, secured by mortgages on the subject property, to BOKC.

The questions to be considered in this appeal are: (1) Was the FDIC properly substituted as a party and, if not, should its appeal be dismissed? (2) Did BOKC have a prior, perfected security interest in the EDI notes and mortgages, giving it priority in the proceeds of the mortgages? (3) Does the Uniform Commercial Code apply to security interests taken in promissory notes, which are in turn secured by real estate mortgages? (4) What was the nature of Army's interest in the EDI notes and mortgages? (5) What is the effect of the subordination agreement between Army and Equibank?

We vacate the judgment of the trial court and remand for further proceedings.

## FACTS

The facts are complicated. Timing is significant. We have set out an event chronology as an appendix to assist in identifying the critical dates.

Equibank Corporation is a company that exists to provide loan participations for nonaffiliated banks (banks that are not affiliated with Equibank, with each other, or with a large holding company). On August 31, 1983, Equibank entered into a participation agreement with Army National Bank. According to Joseph Archias, President of Equibank, the participation agreement established the participation relationship between Equibank and the participating bank; however, it was not necessary for a particular project or loan to be specified at the time of agreement.

On May 15, 1984, EDI, which was developing an area in Wichita called "Greenbrook," executed and delivered to Equibank nine construction notes in the aggregate amount of $1,943,000. According to Archias, neither Army nor Equibank had heard of EDI in August of 1983. The notes were secured by mortgages on the Greenbrook property. The mortgages were recorded by Equibank with the Sedgwick County Register of Deeds on June 15, 1984. On June 7, 1984, Equibank had executed a note in favor of Traders Bank of Kansas City (predecessor in interest to BOKC) in the amount of $800,000. The note listed the nine EDI notes as security for the note and "all other

indebtedness owing to the bank," but no security agreement or assignment was made at that time. Equibank, previously, had executed a note to BOKC for $200,000.

On June 27, 1984, Equibank and Army executed a "certificate of participation" in which Army participated in the loan to EDI in the amount of $1,000,000. According to Archias, at the time the initial participation by Army matured on November 1, 1984, Army had advanced $943,000 pursuant to the certificate of participation. Army agreed to continue, but indicated that it was not interested in increasing its participation beyond $1,000,000. Archias testified that, at the November 1 meeting, he told the representatives of Army that Equibank would obtain additional funds to finish the Greenbrook project through Equibank's line of credit at BOKC. According to Steve Hamilton, who was vice president and senior loan officer of Army at the time of the November 1 meeting (and is now president and chief executive officer of Army), there was "nothing that was said that gave any rise to a secured interest by the Bank of Kansas City."

On November 16, 1984, Equibank pledged, endorsed, and delivered the nine EDI notes and executed assignments of the nine EDI mortgages to BOKC. These assignments were not recorded with the register of deeds until February 12, 1986. Under the terms of the participation agreement between Army and Equibank, instruments executed by the borrower with respect to the loan were to be deposited with an independent custodian. Equibank never deposited the EDI notes with the custodian. The record does not indicate that Army ever inquired if Equibank had done so. Army did not request to see the notes.

EDI experienced financial difficulties. During the spring of 1985, Army and Equibank negotiated to work out the problems. On May 20, 1985, Army and Equibank entered into an agreement in which Army agreed to advance additional money to complete the Greenbrook project. Equibank agreed to subordinate its interest in the EDI notes and mortgages to the interest of Army. In addition, the title to the Greenbrook property was conveyed to Greenbrook Development Corporation, an affiliate of Equibank.

On July 22, 1985, Equibank executed another certificate of participation on behalf of Army in the amount of $417,686 in a loan made to Greenbrook Development Corporation. In addition, Joseph Archias personally guaranteed the debt. Greenbrook

Development executed a promissory note and mortgage to Equibank in the amount of $735,000 in September 1985.

Greenbrook Development Corporation subsequently abandoned the project. In November of 1985, an action was brought against EDI for the enforcement of a mechanic's lien on the Greenbrook project. In addition to EDI, Greenbrook Development, Equibank, Army, and a number of other lien holders were named as defendants.

Army subsequently filed an action to foreclose the real estate mortgages on the Greenbrook property and to determine the various interests of the parties. Army's standing to foreclose is not at issue in this litigation. Army's action named all the parties in the mechanic's lien suit and BOKC. The two cases were consolidated. The many claims arising out of various mechanic's liens on the property were disposed of or settled prior to trial. The case proceeded to trial on the issue of the priorities of Army and BOKC.

In a journal entry of judgment filed March 20, 1987, the trial court ordered the following:

A judgment:

(1) in rem against EDI granted jointly to Army and Maryville Bancshares in the amount of $1,525,314.84 plus interest;

(2) joint and several in rem against Greenbrook Development and in personam against Equibank in the amount of $500,889.39 plus interest granted to Army and Maryville jointly;

(3) giving Army and Maryville the priority lien on the Greenbrook property and foreclosing the nine EDI notes and mortgages and the Greenbrook note and mortgage;

(4) in personam against Equibank in favor of BOKC in the amount of $544,010.36 plus interest;

(5) that in the event that the judgment in favor of Army and Maryville is not paid within ten days, the Greenbrook property shall be sold by the sheriff of Sedgwick County, with the proceeds of the sale to be applied first to the costs of the action; second to the payment of real estate taxes; third to the payment of Army and Maryville's judgment; and fourth into the court to await further order of the court.

The judgment was labeled a final judgment pursuant to K.S.A. 1988 Supp. 60-254(b).

The trial court made the following conclusions of law:

1) The nine EDI notes and mortgages were senior to the later Greenbrook note and mortgage and all the notes and mortgages were in default.

2) Army's rights in the EDI notes and mortgages arose on June 15, 1984, the date the mortgages were recorded.

3) The subordination agreement is binding on the parties and all others who acquired an interest in Greenbrook with actual or constructive notice of the agreement.

4) The May 31, 1985, recording of the subordination agreement constituted notice to third parties.

5) Because BOKC did not record its interest in the EDI mortgages until after the subordination agreement was recorded, BOKC's rights are inferior to those of Army.

The defendants filed timely motions to alter or amend the judgment. The motions were denied (except as to certain minor amendments). The Greenbrook property was sold at a sheriff's sale. Army bid and purchased the property for $1,850,000. The FDIC, which had not previously been in the case, moved to be substituted for BOKC as the real party in interest. The motion was granted. Equibank and FDIC filed timely notices of appeal.

## 1. The FDIC and Substitution

The FDIC filed its motion to substitute at 3:53 p.m. on July 20, 1987. The order granting the substitution was filed at 4:06 p.m. on the same day. The FDIC subsequently filed a notice of appeal. While the instant action was pending before the Court of Appeals (prior to transfer to our court), Army moved to dismiss the appeal on the basis that FDIC was improperly substituted as a real party. The Court of Appeals denied the motion, but gave Army leave to reassert the issue in its brief.

Substitution of parties is governed by K.S.A. 60-225. The applicable provision is 60-225(c):

"In case of any transfer of interest, the action may be continued by or against the original party, unless the court, upon motion, directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in subsection (a) of this section."

Subsection (a) states that the motion for substitution, together with notice of the hearing, *shall* be served on the parties as provided in K.S.A. 1988 Supp. 60-205. K.S.A. 1988 Supp. 60-205

requires that every written motion other than one which may be heard ex parte shall be served upon each of the parties. K.S.A. 60-225 does not authorize ex parte motions for substitution.

Army alleges that FDIC's motion for substitution was not served upon it. No representative of Army or reference to Army is listed on the certificate of service attached to the motion. No notice of hearing was given as required. The order was filed thirteen minutes after the motion was filed. We question if there was a hearing. According to Army, it did not become aware of the motion or the order granting substitution until it received the notice of appeal and later the docketing statement pursuant to FDIC's appeal.

According to the response of FDIC to Army's motion to dismiss appeal, BOKC went out of business in late December 1986, less than a month before this case went to trial. The assets of BOKC were divided between the FDIC and Merchants Bank of Kansas City, Missouri. BOKC's claims against EDI and Equibank vested with FDIC. FDIC listed a number of contacts that its attorneys had with Army's attorney regarding the trial court's journal entry and possible settlement of the case. These contacts occurred between the time of trial (January 15, 1987) and the denial of the defendants' post-trial motions (June 30, 1987). FDIC contends that Army was fully aware of FDIC's interest in the litigation and that Army had tacitly approved the substitution of FDIC in place of BOKC.

Army acknowledges that it had contact with FDIC and that it anticipated that FDIC might enter the case, but it thought FDIC's entry would be through intervention or joinder as an additional party. In Army's reply to FDIC's response to its motion to dismiss the appeal, Army stated:

"Army readily admits that it knew the FDIC had some interest in this lawsuit and that the FDIC had some connection with the Bank of Kansas City. Casual contacts and professional courtesies do not, however, satisfy the legislative mandate for notice and hearing prior to substitution."

We agree. No copy of the motion for substitution or of the order of substitution was ever served upon Army.

In *Long v. Riggs*, 5 Kan. App. 2d 416, 617 P.2d 1270 (1980), the Court of Appeals held that K.S.A. 60-225(a) applies to cases pending on appeal. K.S.A. 60-225(c) may also be construed to apply to cases pending on appeal. Supreme Court Rule 5.03

(1988 Kan. Ct. R. Annot. 21) states that the clerk of the appellate courts may rule on motions to substitute parties if the motion is unopposed. In *Gatewood v. Bosch,* 2 Kan. App. 2d 474, 476, 581 P.2d 1198 (1978), the Court of Appeals said, "[R]evivor (or substitution of parties) is purely a matter of statutory law and strict compliance with statutory requirements must be shown before a revivor is effective." None of the cases cited by either party, however, specifically address the issues raised by Army. K.S.A. 60-225 requires notice and hearing prior to substitution of the party.

FDIC asserts that Army's actions in opposing the substitution were also procedurally defective. FDIC argues that Army should not be allowed to raise the issue as it had taken no action to oppose the substitution or to appeal the order. FDIC said, "the District Court is the proper venue for Army to make its arguments now being contended before this Court." This argument is flawed, however, as Army has stated that it was not aware of the substitution until after the notice of appeal was filed. Therefore, by the time Army knew of the substitution, the district court no longer had jurisdiction. An order of substitution is not a final order, and is not appealable. *Howard v. Bank,* 107 Kan. 489, Syl. ¶ 2, 192 Pac. 746 (1920).

The substitution of FDIC for BOKC was procedurally defective. The question remains, however, whether the situation warrants dismissal of FDIC. We believe that it does.

The procedure that the FDIC utilized violated other Kansas Rules of Civil Procedure. K.S.A. 1988 Supp. 60-206(d) requires:

"A written motion, other than one which may be heard *ex parte,* and notice of the hearing thereof shall be served not later than five days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the judge."

K.S.A. 1988 Supp. 60-205(a) requires that "every written motion other than one which may be heard *ex parte*" shall be served on each of the parties. A motion wherein a stranger to the action is seeking to become the defendant without the plaintiff's consent is not a matter that can be heard ex parte.

Strict compliance with the statutory provisions permitting a substitution of parties must be shown in order to achieve substitution.

Army was entitled to know with whom it was or may be

litigating. To permit FDIC to remain in this case would require us to cover the requirements of K.S.A. 60-225 with judicial camouflage.

The parties speak of casual contacts between counsel, and of informal knowledge by Army of FDIC's intentions. Under the facts of this case, as shown by the record, these casual contacts and professional courtesies in no way constitute a waiver of statutory safeguards by Army or impose on Army an obligation to have anticipated its possible objections to FDIC's participation in this lawsuit.

The process employed by the FDIC to attempt to bring this appeal fails to provide the FDIC with standing to prosecute the appeal. The appeal of the FDIC is dismissed.

Upon remand, we assume FDIC, should it choose to do so, will assert its interests in a manner that complies with the statutory requirement for substitution, notice, and hearing.

## 2. Security Interests in Promissory Notes
### Secured by Real Estate Mortgages—Application
### of the Uniform Commercial Code

Equibank also filed a timely notice of appeal. Equibank raises similar issues and makes similar arguments to those advanced by FDIC. Equibank argues that BOKC had a prior perfected security interest under Article 9 of the Uniform Commercial Code and, consequently, an interest in the nine notes and mortgages superior to that of Army. We agree.

Our initial inquiry relates to whether the nine EDI promissory notes were instruments under Article 9 of the Uniform Commercial Code.

Army contends that FDIC and Equibank's arguments are not persuasive because the EDI notes were not negotiable and, therefore, were not instruments as defined by the UCC. K.S.A. 1988 Supp. 84-9-105(1)(i) defines an instrument as:

"[A] negotiable instrument (defined in K.S.A. 84-3-104 and amendments thereto), or a certificated security (defined in K.S.A. 84-8-102 and amendments thereto) or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment."

Army argues that, because a negotiable instrument as defined by K.S.A. 84-3-104 requires an unconditional promise to pay a

"sum certain," the EDI notes are not negotiable and are not instruments under Article 9. The EDI notes provided for a variable interest rate and, therefore, do not state a "sum certain." Army, however, ignores the second part of K.S.A. 1988 Supp. 84-9-105(1)(i), "any other writing which evidences a right to the payment of money . . . ."

In Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 7.03, p. 7-8 (2d ed. 1988), the author discusses the case of *In re Coral Petroleum, Inc.*, 50 Bankr. 830 (Bankr. S.D. Tex. 1985), and says:

"In short, the definition of 'instrument' in the UCC is broad and intentionally incorporates standard banking practice. The fact that the note was nonnegotiable and of limited transferability did not prevent it from being an instrument that could be pledged as collateral and for which possession was the only proper method of perfection."

Both negotiable and nonnegotiable notes are instruments under Article 9. The distinction between the two comes into play where a holder in due course status is asserted pursuant to Article 3. Holder in due course and Article 3 concepts are not applicable to the instant case. The EDI notes were instruments within the definition stated in Article 9.

Pursuant to K.S.A. 1988 Supp. 84-9-304(1), a security interest in instruments may only be perfected by possession of the instrument. There is no dispute that BOKC took possession of the EDI notes. BOKC also satisfied the attachment and enforcement requirements of K.S.A. 1988 Supp. 84-9-203 in that BOKC took possession of the notes and mortgages and extended credit to Equibank. Equibank, as sole payee named on the notes and mortgages, had rights in the collateral.

We next consider the key question in this appeal: Is the priority to foreclose a mortgage securing a note, which has been transferred and delivered with its mortgage assigned by a mortgagee as security for its own borrowing, controlled by the Uniform Commercial Code or by state real estate law?

Although Article 9 applies to BOKC's security interest in the EDI notes, its effect on the EDI mortgages requires further analysis. The experienced trial judge in the case at bar acknowledged the complexity of this key question when he observed, "Well I feel like Army and Maryville ought to win. I am not unmindful of the lameness of this problem with respect to that subordination agreement and whether it will hold up as I have construed it."

K.S.A. 84-9-104 states, in part:

"This article does not apply

. . . .

(j) except to the extent that provision is made for fixtures in section 84-9-313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder."

In contrast, K.S.A. 84-9-102(3) states:

"The application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply."

According to Professors White and Summers, the issue of perfection of security interests in instruments secured by real estate mortgages has created conflict in the case law; however, a consensus is now emerging. 2 White and Summers, Uniform Commercial Code 270 (3d ed. 1988).

White and Summers endorse the analysis made in *In re Kennedy Mortg. Co.,* 17 Bankr. 957 (Bankr. D.N.J. 1982). In *Kennedy,* an involuntary bankruptcy action was brought against Kennedy Mortgage Company (Kennedy). Kennedy was engaged in the business of obtaining funds for mortgage applicants and processing mortgage applications. Kennedy established a line of credit with the First National Bank of Boston (First) similar to the arrangement between Equibank and BOKC. As collateral, Kennedy delivered five promissory notes secured by mortgages and executed assignments of the mortgages to First. The mortgages were properly recorded in accordance with state law, but the assignments to First were not recorded. Several of Kennedy's other creditors disputed First's claim that it had a perfected security interest in the notes and mortgages. The bankruptcy court held "that it is not necessary under the Uniform Commercial Code or the Bankruptcy Code or State Statutes for an assignee of a mortgage to record the assignment of the mortgage in order to have a secured status." 17 Bankr. at 962.

The court gave several rationale for its decision. First, the recording statutes are designed to protect the mortgagee as against other creditors of the mortgagor, not to protect one creditor of the mortgagee as against another creditor of the mortgagee. The recording statutes are also designed to establish the rights of individuals affected by the chain of title on the real

estate. The court also cited the impact that requiring recording of assignments of mortgages would have on the mortgage financing industry. It said that the sources of funds that mortgage brokers now have would be disrupted and the availability of funds would be reduced. Finally the court said: "Without the manifestation of the debt, usually evidenced by a note or bond, the mortgage instrument itself is subject to attack. The lien of a mortgage is regarded as no greater than the actual debt secured." 17 Bankr. at 965.

The *Kennedy* case was analyzed with approval in Krasnowiecki, Miller & Ziff, *The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks,* 56 Am. Bankr. L.J. 325, 338 (1982):

"Persons seeking to acquire rights *in the mortgage* must know that they will have no right to enforce the mortgage unless they have a right to enforce the underlying obligation. The law is very clear on this point. People who deal in mortgages are not ordinary consumers. Surely it is not too much to expect them to inquire where the note is. Furthermore, quite apart from the mortgage law which says that the mortgage cannot be enforced except for the obligation, there can be no doubt that the UCC covers security interests in mortgage notes and that possession of the note is sufficient to perfect an interest in it. This fact must be widely known in the trade. Therefore, anyone who gives value for or asserts a claim against a mortgage should inquire where the note is. Indeed, the courts have uniformly held that possession of the note puts everyone who deals with a record mortgagee on notice of the outstanding claim."

The recording acts were not intended to apply as to entities who deal in the mortgage paper itself, but to protect the mortgagor and those dealing with the underlying land. 56 Am. Bankr. L.J. at 346. We agree.

White and Summers adopt Krasnowiecki's view that the parties to these transactions live in two separate worlds, that of the mortgagee and that of the mortgagor. 2 White and Summers, Uniform Commercial Code 271 (3d ed. 1988).

For a listing of cases consistent with *Kennedy Mortgage* in recognizing that the lender perfects a security interest when the lender takes possession of the note, see 2 White and Summers, Uniform Commercial Code 272 n.18 (3d ed. 1988).

The Official Comment 4 to K.S.A. 84-9-102 states:

"An illustration of subsection (3) is as follows:
The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee,

even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this Article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage. This Article leaves to other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or nonrecording of an assignment of the mortgagee's interest."

Prior to 1962, this comment was worded somewhat differently. It originally suggested that both the note and the mortgage were covered under Article 9. The language referring to the mortgage was deleted and the sentence about leaving to other law the effects on rights under the mortgage was added. Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 1.08[10][a], p. 1-112 n.372. Kansas has adopted these amendments.

The issue of whether an assignment of a mortgage must be recorded has not been addressed by our court in recent years. In *Anthony v. Brennan,* 74 Kan. 707, 709, 87 Pac. 1136 (1906), this court said:

"That act [L. 1899, ch. 168, relating to the assignment of real estate mortgages] does not undertake to limit the methods by which real estate mortgages may be transferred, and it does not provide that the failure to make a record of an assignment of a mortgage shall invalidate the security or the transfer. It was intended as a protection to mortgagors, and the only penalty prescribed for not recording the transfer is that all payments made by the mortgagor to the mortgagee or to any one who appeared to be the owner shall be credited to the mortgagor, although the assignee never received such payments."

In the cases of *Middlekauff v. Bell,* 111 Kan. 206, 207 Pac. 184 (1922), and *Pletcher v. Albrecht,* 186 Kan. 273, 350 P.2d 58 (1960), the *Anthony* decision was cited and relied upon. In *Middlekauff,* this court said:

"An assignment of a mortgage is merely a formal transfer of title to the instrument, and the assignment from the bank to the plaintiff was admittedly good for that purpose. The plaintiff, however, did not need the assignment in order to invest her with ownership of the mortgage. She acquired full title by purchase of the note which it secured, and the assignment may be excluded from consideration without prejudice to her lien." 111 Kan. at 207.

K.S.A. 58-2308 requires that all assignments of mortgages shall be recorded by the register of deeds. In *Perkins v. Matteson,* 40 Kan. 165, 19 Pac. 633 (1888), this court said that although the assignment of an instrument carries with it any underlying security for the debt, an unrecorded assignment of a mortgage is

void except between the parties and those with actual notice. The *Anthony, Pletcher,* and *Middlekauff* decisions, however, indicate that failure to record an assignment of a mortgage is only a fatal error where it has prejudiced the rights of the mortgagor.

Professor Clark has addressed the issue of the application of Article 9 to security interests in notes secured by real estate:

"The notes may be of little value as personal obligations of the homeowners; their real worth comes from the mortgages that secure them. Therefore, in addition to taking possession of the notes, Bank must make sure that the mortgage documents are properly recorded under state real estate law. Perfecting as to the notes may not perfect as to the underlying real estate, which is excluded from the ambit of Article 9. Conversely, the fact that the real estate recording is not covered by Article 9 does not alter the fact that Article 9 applies to the note itself, so that possession is critical." Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 7.04 at pp. 7-9 to 7-10.

Our view is that the mortgage follows the note. A perfected claim to the note is equally perfected as to the mortgage. This view is supported by Professors Nelson and Whitman in their text. See Nelson and Whitman, Real Estate Finance Law 370 (2d ed. 1985).

The parties cite *In re Maryville Sav. & Loan Corp.*, 743 F.2d 413 (6th Cir. 1984), *aff'd on reh.* 760 F.2d 119 (6th Cir. 1985). In *Maryville*, a bank made a loan to Maryville for which Maryville assigned promissory notes and deeds of trust to the bank as collateral. The bank did not take possession of the notes, but it did record the assignment with the register of deeds in the county in which the real estate was located. The bank argued that it had a perfected security interest because it had duly recorded the assignment as required by real property law. The trustee in bankruptcy argued that the bank's failure to take possession of the notes rendered the interest unperfected pursuant to Article 9 of the UCC. The bankruptcy court found for the trustee, but was reversed by the district court. 743 F.2d at 415.

The Sixth Circuit Court of Appeals first noted that both the bankruptcy court and the district court assumed that the UCC applied either to the entirety of the transaction or that it did not apply at all. 743 F.2d at 415. The court said that Comment 4 to 9-102 of the UCC indicates that the security interest in the promissory note should be analyzed separately from the interest created in the deed of trust. "[W]e conclude that article nine applies to the plaintiff's security interest but only in the promis-

sory notes themselves. Since plaintiff did not take possession of the notes, plaintiff's security interest in the notes was not perfected." 743 F.2d at 416-17.

The court concluded that the bank's interest in the deeds of trust was perfected. The original opinion did not explain the effect of this holding. 743 F.2d at 417. The parties moved for clarification as to the proper handling of the funds paid to the trustee on the promissory notes at issue. 760 F.2d at 120.

White and Summers are critical of the *Maryville* decision. They argue that splitting the perfection of the note and the mortgage would have the effect of requiring the mortgagor to pay twice in order to get free and clear title to his property because one creditor will have claim to the note and the other will have a mortgage that will not be discharged by payment to the note holder.

"Every conceivable proposition, good or bad, has a champion in the cases. In our view, *Kennedy Mortgage* is the correct analysis. One in possession of the note should be regarded as having a perfected security interest in that note, with the mortgage to follow it. Absent possession of the note, the trustee prevails. Such an outcome facilitates lending and, at least with respect to sophisticated persons, protects subsequent parties who will necessarily ask to see the negotiable instrument." 2 White and Summers, Uniform Commercial Code 273-74 (3d ed. 1988).

We reason that a mortgage cannot exist separately from the note it secures. A mortgage without a note is worthless. In our view, the problem with splitting the perfection of the note and the mortgage is that Article 9 would be applicable to the security interest in the note and real property law would be applicable to the security interest in the mortgage. We can foresee that in priority contests one party would have a perfected interest in the note and another party would have a perfected interest in the mortgage. The result could be a situation where the creditor of the assigning mortgagee is left with either a note absent its security or a mortgage which may be worthless.

The parties also cite two related cases, *Matter of Staff Mortg. & Inv. Corp.*, 550 F.2d 1228 (9th Cir. 1977), and *In re Staff Mortg. & Inv. Corp.*, 625 F.2d 281 (9th Cir. 1980). Both cases arose out of the bankruptcy of Staff, which was in the business of buying and selling promissory notes secured by trust deeds. In each of the cases, Staff had borrowed money from the plaintiffs and the loans were secured by pledges of promissory notes

secured by trust deeds. In both cases the assignments were recorded in the appropriate county, but Staff retained possession of the documents. The Ninth Circuit Court of Appeals held that, although the recording may have served as notice to interested parties who checked the county records, it was not sufficient to perfect a security interest in the instruments pursuant to the Uniform Commercial Code. 550 F.2d at 1230. "Perfection of a security interest in an instrument can only occur with the actual possession of the instrument by the secured party or by an agent or bailee on his behalf." 625 F.2d at 283.

We reason that the mortgagee's creditor would be perfected by possession as to other creditors of the mortgagee, but would be required to record its interest in order to be perfected as to creditors of the mortgagor. This approach is in accordance with the purposes of the recording acts: to protect the interests of the mortgagor. The creditors of the mortgagee should inquire as to the whereabouts of the underlying promissory note.

We read K.S.A. 84-9-104(j) in connection with the plain meaning of K.S.A. 84-9-102(3) and hold that Article 9 of the UCC governs the collateral assignment of the real property interests, the mortgages, securing the nine notes as well as governing the collateral assignment of the notes. See *Landmark Land Co., Inc. v. Sprague*, 529 F. Supp 971, 977 (S.D.N.Y. 1981); *In re Atlantic Mortg. Corp.*, 69 Bankr. 321 (Bankr. E.D. Mich. 1987).

3. Army National's Interest in the EDI Notes and Mortgages

The trial court made the following finding of fact as to Army's notice of BOKC's interest in the EDI mortgages:

"Testimony presented by The Bank of Kansas City and Equibank intended to prove notice on the part of Army representatives is not credible. To find notice of the unrecorded assignment would be to put in the minds of the Army representatives knowledge that the man they were dealing with was guilty of a breach of fiduciary duty. The Court is satisfied that the testimony of Mr. Dickinson falls short of showing notice of the assignment."

The standard of appellate review of findings of fact has been stated numerous times by this court. The court must determine if the findings are supported by substantial competent evidence and whether they are sufficient to support the trial court's conclusions of law. *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988). "Upon appellate review, this court accepts as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the

trial judge." *Short v. Wise,* 239 Kan. 171, 178, 718 P.2d 604 (1986).

The trial court found that Army had no notice of the assignment of the mortgages to BOKC. There was substantial competent evidence to support the trial court's finding. In our view, however, the fact of Army's lack of notice of the mortgages' assignment to BOKC does not affect BOKC's priority.

Army appears to have been careless in its dealings with Equibank. In May 1985, Army knew that there were problems with the Greenbrook project but it agreed to advance more money to Equibank and to the project without either inquiring as to the whereabouts of the EDI notes or requesting Equibank to deposit them with an independent custodian as set out in the participation agreement.

The testimony indicated that Archias, the president of Equibank, assured the Army representatives that BOKC did not have a claim on the project. Apparently, Army trusted Archias. We note that apparently BOKC also trusted Archias. BOKC finally recorded the Equibank assignments February 12, 1986, after the recording of the Army-Equibank subordination agreement (May 31, 1985) and the Greenbrook Development Corporation-Equibank mortgage (February 7, 1986).

Our analysis continues as we ask: What interest, if any, did Army have in the EDI notes and mortgages by virtue of its participation in the loans to EDI?

The Army-Equibank participation agreement stated that Army wanted to "purchase an undivided fractional interest" in the loan. Paragraph 14 of the agreement reads:

"Any promissory note evidencing the Loan (the 'Note') shall be made payable to Equibank and any security interests, security agreements, financing statements, pledges, liens, deeds of trust or mortgages (hereafter collectively referred to as the 'Security Documents') executed or granted by the Borrower to secure the repayment of a Loan shall be granted to Equibank. Even though the Note is to be made payable to Equibank and the Security Documents are to be granted to it, Equibank acknowledges that the Note and Security Documents are held by it for its own account (if it has an interest in the Loan) and as agent for the account of the Participants in the Loan. If the Collateral consists of personal property and it is necessary that said personal property be in the possession of the secured party or its agent in order that the security interest be perfected, then such personal property shall be promptly deposited by Equibank with an independent custodian (the 'Custodian') for the benefit of Equibank and the Participants in the Loan. *The Note, the original or recorded Security Documents and other in-*

*struments executed by the Borrower and/or Equibank with respect to a Loan shall also be deposited with the Custodian."* (Emphasis added.)

The original participation certificate stated that Army had acquired and is the owner of a participation in the amount of $1 million, as evidenced by the EDI notes.

The signatures on the participation agreement between Equibank and Army and on the participation certificates were not acknowledged as required by K.S.A. 1988 Supp. 58-2211 for instruments affecting real estate.

Army executed a $1,000,000 participation agreement on June 27, 1984, but it took no steps to protect any interest in the notes and mortgages. Neither the participation agreement nor the certificate were acknowledged or recorded. Army did not require Equibank to deposit the notes with an independent custodian as called for in the participation agreement.

"Where an intangible claim is represented by a tangible instrument or obligation, such as a promissory note, an insurance policy, or a lease, the participant who fails to take possession is exposed to a loss of priority upon a subsequent further transfer, based on principles of equitable estoppel or the application of such another legal doctrine as the principle that a subsequent equitable assignee who succeeds in acquiring the legal title, without notice of the prior equitable assignment, obtains a better right." Simpson, *Loan Participations: Pitfalls for Participants*, 31 Bus. Law. 1977, 2011-12 (1976).

BOKC was granted a security interest in the notes and mortgages on June 7, 1984. It did not perfect that interest until November 16, when it took possession of the notes and properly acknowledged assignments of the mortgages.

We do not agree that Army's rights in the EDI notes and mortgages arose on June 15, 1984, the date the mortgages were recorded. As of June 15, 1984, all that existed between Army and Equibank was the participation agreement, which did not contemplate any specific loan. It merely set out the conditions by which Army might participate in a loan in the future. It was not until June 27, 1984, when the first participation certificate was executed, that Army advanced any money to purchase a participation in the EDI loan.

Army argues that it was a bona fide purchaser for value by virtue of its purchase of the participation certificate on June 27, 1984. It contends that, because of this status, it took free of any unperfected security interest that BOKC might have had at the time. Army, however, neither took possession of the collateral,

recorded its interest, nor required Equibank to deposit the collateral with an independent custodian as contemplated by the agreement. The participation agreement states that Army is purchasing an undivided fractional interest in the *loan*, not in the notes and mortgages. Army does not advance a persuasive legal argument as to why it should be given bona fide purchaser status.

As between BOKC's security interest in the notes and mortgages and Army's interest by virtue of its participation in the loans to EDI, BOKC has priority.

### 4. The Effect of the Subordination Agreement

The trial court found that the subordination agreement was binding on BOKC because it was recorded prior to BOKC's recording of the assignment of the nine mortgages and, therefore, was constructive notice to BOKC.

The trial court reasoned that the assignment of the EDI notes and mortgages to BOKC was inferior to the interest of Army because BOKC did not record the assignment until after Army had recorded the subordination agreement. The recording of the subordination agreement imparted actual or constructive notice of Army's interest to any entity acquiring an interest in Greenbrook, including BOKC.

Army argues that the May 1985 subordination agreement operates as an equitable assignment of the EDI notes and mortgages. Because its interest was recorded prior to the recording of the assignment to BOKC, Army contends that it has priority in the proceeds of the mortgage.

At the time the subordination agreement was executed, Equibank, as we have determined herein, had already transferred its rights in the EDI notes and mortgages to BOKC and, therefore, had no rights which it could subordinate. In *Patrons State Bank & Trust Co. v Shapiro*, 215 Kan. 856, 861, 528 P.2d 1198 (1974), this court said: "The Kansas cases clearly state the rule to be that an assignment passes all of the assignor's title or interest to the assignee, and divests the assignor of all right of control over the subject matter of the assignment."

BOKC became properly perfected upon taking possession of the notes and the assignments of the mortgages. The subordination agreement cannot have any effect on the rights of BOKC.

Equibank argues that the subordination agreement does not create a lien or security interest in favor of Army. We agree. In

the contest of priorities in the instant fact situation, the UCC controls. BOKC had a perfected security interest in the nine EDI notes and mortgages on November 19, 1984, by virtue of its possession.

The journal entry of judgment of January 15, 1987, is vacated. The case is remanded to the trial court for further proceedings in conformity with our holding that BOKC has a superior right in the nine EDI notes and mortgages. The EDI notes and mortgages have priority over the Greenbrook note and mortgage. BOKC has a priority to foreclose upon the Greenbrook project supported by its interest in the EDI notes and mortgages. The dollar amount of BOKC's interest secured by the nine EDI notes and mortgages as well as any other issues remaining between the parties as a result of our decision should be determined by the trial court upon remand.

Vacated and remanded.

APPENDIX

Aug. 31, 1983 ------- Army and EquiBank enter into Original Agreement of Participation.

BOKC lends $200,000 to ------------------ Mar. 20, 1984
EquiBank.

EDI makes, executes, and ---------------- May 15, 1984
delivers nine notes and mortgages to
EquiBank. Total amount of principal
$1,943,175.

BOKC lends $800,000 to ------------------ June 7, 1984
EquiBank, takes security interest in
EDI notes and mortgages.

EquiBank records nine -------------------- June 15, 1984
EDI morgages in Sedgwick County,
Kansas.

June 27, 1984 ------- Army executes $1,000,000 Participation Certificate.

July 5, 1984 --------- Army purchases first interest in participation in the amount of $308,628.17. Army conducts series

*of purchases through Nov. 16, 1984.*

Nov. 1, 1984 -------- Army executes second $1,000,000 Participation Certificate.

EquiBank pledges, endorses------------Nov. 16, 1984 and delivers EDI notes to BOKC as collateral for $200,000 and $800,000 notes.

EquiBank assigns and---------------------Nov. 19, 1984 delivers EDI mortgages to BOKC as collateral for $200,000 and $800,000 notes.

May 20, 1985 -------- Greenbrook Development Corporation formed prior to May 20, 1985.

EquiBank and Army execute Subordination Agreements.

EDI transfers Greenbrook Project to GDC.

Meeting between EquiBank and Army regarding workout and effect on BOKC.

May 31, 1985 -------- EquiBank-Army Subordination Agreement recorded.

July 22, 1985-------- Army executes third Participation Certificate in amount of $417,686.

Aug. 12, 1985-------- Army purchases participation interest in amount of $300,000 pursuant to July 1985 Participation Certificate.

Sept. 10, 1985 ------Army begins series of advances to

EquiBank, totaling $783,000, pursuant to EquiBank note from Sept. 10, 1985 through Jan. 3, 1986.

EquiBank executes $735,000 note in favor of Army.

GDC gives mortgage to EquiBank.

EquiBank collaterally assigns GDC mortgage to Army as collateral for $735,000 loan.

Feb. 7, 1986-------- GDC mortgage recorded.

BOKC records EquiBank------------------Feb. 12, 1986 assignments.

Nov. 20, 1986------- Army records assignment of GDC mortgage.