In re SGE MORTGAGE FUNDING CORPORATION, Debtor.

SGE Mortgage Funding Corporation, Plaintiff,

v.

Accent Mortgage Services, Inc., et al., Defendants.

Bankruptcy No. 99–71191.
Adversary No. 00–7013.

United States Bankruptcy Court,
M.D. Georgia,
Valdosta Division.

Dec. 7, 2001.

Ben F. Easterlin, IV, King & Spalding, Atlanta, GA, Ward Stone, Jr., Stone & Baxter, LLP, Macon, GA, for debtor.

Wesley J. Boyer, Katz, Flatau, Popson & Boyer, LLC, Ed S. Sell, III, Sell & Melton, Macon, GA, William B. Brown, George H. Myshrall, Jr., Heyman & Sizemore, LLC, Kevin B. Buice, Mary Grace Diehl, Linda K. Klein, Davis K. Loftin, Lynwood A. Maddox, Richard B. Maner, C. LeeAnn McCurry, Thomas Rosseland, Gregory G. Schultz, Thomas Paty Stamps, L. Matt Wilson, Atlanta, GA, Richard Farnsworth, Ray S. Smith, III, Tucker, GA, David A. Garland, Albany, GA, Anna S. Gorman, Poyner & Spruill LLP, Charlotte, NC, Joseph B. Gray, Jr., Render M. Heard, Jr., Carter & Richbourg, L.L.P.,

Melinda Banks Phillips, Rob Reinhardt, John S. Sims, Jr., John C. Spurlin, Tifton, GA, Richard A. Greenberg, Tallahassee, FL, Stephen D. Lerner, Gregory A. Ruehlmann, Cincinnati, OH, James R. Marshall, Decatur, GA, William C. McCalley, Moultrie, GA, Fife M. Whiteside, Columbus, GA, for defendants.

Andrew J. Ekonomou, Michael G. Lambros, Boyce, Ekonomou & Atkinson, Atlanta, GA, Ward Stone, Jr., Mark S. Watson, Stone & Baxter, LLP, Macon, GA, for plaintiff.

## *MEMORANDUM OPINION*

JOHN T. LANEY, III, Bankruptcy Judge.

On July 13, 2001, the court held a hearing on the motions for partial summary judgment of First Family Financial Services, Inc., Associates Financial Services of America, Inc., and Associates Home Equity Services, Inc., (collectively, "Associates"), and the Committee of Investors Holding Unsecured Claims ("Committee"). The parties filed briefs, response briefs, affidavits and stipulations of fact. At the conclusion of the hearing, the court took the motions for partial summary judgment under advisement. The court has considered the parties' briefs, affidavits, stipulations of fact, oral arguments, and the applicable statutory and case law. For reasons that follow, the court will grant in part and deny in part, the Associates' motion and will deny the Committee's motion.

## *FACTS*

The prepetition debtor, SGE Mortgage Funding Corporation ("SGE"), was a residential mortgage broker licensed in Georgia. A large portion of SGE's business involved SGE's solicitation and origination of loans to potential borrowers desiring to obtain loans secured by real estate. SGE funded its mortgage loan origination business through cash investments made by individual investors. The transactions between SGE and these investors were memorialized in a written contract ("Investor Contract"). (Doc. # 559, Exh. "A").[1]

Each Investor Contract provided that the investor would loan SGE a certain amount of money. SGE would utilize these funds in its lending business to individual borrowers. In return for the investors' loan, SGE would pay the investor a monthly amount based on an interest rate designated in the Contract. (Exh. "A" at ¶ 1).

Each Investor Contract also identified a specific borrower and loan which SGE represented that it had made using the investor's funds. If for some reason, the loan to the borrower did not close, the Contract provided that the funds advanced to SGE by the investor would either be returned to the investor or the funds would be used for some other transaction. Upon closing the loan to the specific borrower identified, the Contract further provided that SGE would "transfer and assign all of its right, title, and interest in and to Borrower's Note and deed to secure debt to [the] [investor]." (*Id.* at ¶ 5). This transfer and assignment was to be recorded in the county where the real estate was located. Although the loan documents were to remain the property of SGE, these documents were to serve "as collateral . . . for

---

1. The Associates and the Committee stipulate that Exhibit "A" contains some sample Investor Contracts which do not differ in any material respect from all of the Investor contracts entered into by SGE with each individual investor. (*Id. Stipulations of Fact* at ¶ 3).

Although SGE agrees that all *"known"* transactions were memorialized into written contracts, SGE avers that there may exist Investor Contracts that do not mirror the language in the sample Investor Contracts. (See Doc. # 605 at ¶¶ 3–5).

repayment of the debt owed by [SGE] to [the] [investor]." (*Id.*). Moreover, the Contract required SGE to deliver the original documents to the investor if the investor so requested. Unless the investor requested otherwise, SGE would serve as the servicing agent for the loan that SGE had made to the borrower with the investor's funds. (Id. at ¶¶ 2–5).

The Associates are consumer lending companies licensed in Georgia. One aspect of the Associates' business is to make bulk purchases of portfolios of real estate loans from mortgage brokers. All three of the Associates entities engaged in bulk purchases of loans from SGE. First Family Financial Services purchased approximately 230 mortgage loans for which it paid SGE approximately $3.5 million. (*Id.* at ¶ 23). Associates Financial Services of America purchased approximately 30 mortgage loans from SGE at a purchase price of approximately $1.3 million. (*Id.* at ¶ 24). Associates Home Equity Services paid SGE approximately $564,000.00 for approximately 26 loans it purchased from SGE. (*Id.* at ¶ 25). The transactions between these entities and SGE were memorialized into written agreements. (Doc. # 559, Exh. "B", "C" and "D"). After the Associates purchased the loans from SGE, the Associates assumed all aspects of loan management. (Doc. # 559 at ¶ 19).

However, before SGE sold these loans to the Associates and other bulk purchasers, SGE had been engaged in a classic Ponzi scheme. Upon closing a mortgage loan to an individual borrower, SGE would assign that loan to not only one investor, but numerous investors. Like many Ponzi schemes, SGE used funds obtained from later investors to pay the monthly principal and interest payments due to the earlier investors. SGE drew the Associates into its fraudulent scheme by selling loans

to the Associates which SGE had "double-booked" to numerous investors.

On September 27, 1999, an involuntary petition under Chapter 7 of the Bankruptcy Code ("Code") was commenced against SGE. On December 10, 1999, this case was converted to a Chapter 11 case. On June 28, 2000, SGE as debtor-in-possession, filed this adversary proceeding to determine the validity, priority, and extent of the interest in the loans claimed by the investors and the bulk purchasers. Numerous investors and consumer lending companies such as the Associates were named as defendants.

After several months of discovery, the Committee and the Associates filed motions for partial summary judgment to which several consumer lending companies, investors, and SGE responded. These motions present two issues: (1) whether the Uniform Commercial Code ("UCC") or the Georgia real estate recording statutes ("recording statutes") governs the priority of interests in the loan transactions; and (2) whether the Associates are holders in due course of the loans they purchased from SGE.

## DISCUSSION

In dealing with motions for summary judgment, Federal Rule of Civil Procedure 56 is made applicable to adversary proceedings in bankruptcy cases by Federal Rule of Bankruptcy Procedure 7056. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Like a district court, a bankruptcy court must determine that there are no

issues of material fact and accept all undisputed facts as true in order to find that summary judgment is warranted as a matter of law. *Gray v. Manklow (In re Optical Technologies, Inc.)*, 246 F.3d 1332, 1334 (11th Cir.2001). An issue is "material" if it affects the outcome of the case under the applicable law. *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir.1996).

In the typical motion for summary judgment, the court must apply the undisputed facts to the applicable law. However, the first issue before the court requires it to determine which law is the applicable law.

The Committee and the Carlyle/Casko investor entity ("Carlyle/Casko Investors"[2]), argue that the recording statutes, not the UCC, is the applicable law. The Committee contends that the investors and bulk purchasers, such as the Associates, failed to record the assignments of the deeds to secure debt. As a result, these entities have no ownership interest in the loans superior to that of the trustee. Therefore, the Committee and the Carlyle/Casko Investors contend that the loans are property of the estate. The Committee also argues that the Associates' interests are likewise unperfected. Although the Associates may have purchased the notes of which they have possession, the Committee contends that the Associates failure to record the assignments is fatal to their perfection.

The Associates and SGE argue that the UCC is the applicable law. Although real estate was involved in the transactions between SGE and the investors, the Associates contend that the UCC governs because the transactions entailed the transfer of promissory notes, which are negotiable instruments.[3]

Similar to the Carlyle/Casko Investors, individual investors James and Debra Mills ("Mills") filed a response to the Associates' and the Committee's motions maintaining that the UCC is not the applicable law. The Mills assert that the mortgages assigned to them by SGE were not included in the ones that SGE assigned to the Associates in their bulk purchase. Even if this is not the case, the Mills argue that SGE executed an assignment of the actual security deed to them which they then recorded. Under the applicable recording statutes, the Mills maintain that recording the deed and assignment is sufficient to perfect their interest. The Mills further insist that having possession of the original notes is not necessary to perfect their interest in the collateral.

Under Georgia law, transactions that result in the "creation or transfer of an interest in or lien on real estate ..." are excluded from Article 9 of the UCC. O.C.G.A. § 11-9-104(h) (1994 & Supp. 2000). Therefore, the focal point of the issue before the court is whether the transactions between SGE, the Associates, and the investor entities create or transfer an interest in real estate.

The Associates rely on the case of *Chen v. Profit Sharing Plan*, 216 Ga.App. 878, 456 S.E.2d 237 (1995). In a case involving

---

**2.** This entity consists of approximately 100 individual investors who are present and former clients of Carlyle Wealth Planning, Inc. These individuals invested approximately $6,000,000.00 in the Casko Investment Company to fund the lending to individual borrowers. SGE was the "servicing agent" for the Carlyle/Casko investments. (See Doc. # 559, Exh. "A").

**3.** The court notes that Accent Mortgage Services, Inc. ("AMS"), another consumer lending company defendant filed a response to the Committee's Motion. In their response, AMS adopted the Associates' brief in full. Therefore, the court's reference to the Associates encompasses AMS as well.

a transaction similar to the one between SGE and the investor entities, the Georgia court of appeals concluded that the parties' transaction did not involve a creation or transfer of an interest in real estate. *See Chen*, 216 Ga.App. at 881, 456 S.E.2d at 241. Therefore, the court held that the UCC was the applicable law. *Id.*

In *Chen*, Blankenship granted a security interest in his real property to Chen. This security interest was evidenced by Blankenship's executing a promissory note and security deed to Chen. Under the terms of the promissory note, Blankenship was to pay Chen 120 monthly installments. Before Chen received the first payment from Blankenship, Chen entered into an agreement with the Profit Sharing Plan ("Plan"). In exchange for a loan from Plan, Chen assigned it the first 60 payments under the Blankenship note. Chen also assigned to Plan the Blankenship note and security deed. In addition to these assignments, Chen executed a document which provided that Plan would be the servicing agent of the Blankenship note. Plan agreed to reassign the note and security deed to Chen after Plan received the 60 payments. *Id.* at 879, 456 S.E.2d at 239.

Approximately two years after this agreement, Plan made another loan to Chen whereby Chen pledged the Blankenship note and security deed as collateral. Chen executed a transfer and assignment of the note and security deed. Along with the transfer and assignment, Chen also executed an addendum in which Chen agreed to sell the remaining 60 installments to Plan. The addendum contained a default provision allowing Plan to retain the collateral in the event Chen failed to make the payments. After making 18 payments to Plan, Chen defaulted on the second loan and Plan sent a letter to Chen indicating its intent to retain the collateral. *Id.* at 878–79, 456 S.E.2d at 239.

The central issue in *Chen* was whether Plan's letter to Chen was adequate notice under O.C.G.A. § 11–9–505(2). The trial court found that the notice did satisfy the requirements of § 11–9–505(2). *Id.* at 882, 456 S.E.2d at 241. On appeal, Plan argued that Chen was not entitled to notice under § 11–9–505(2) because pursuant to § 11–9–104(h), the transaction was excluded from Article 9 of the UCC.

Reversing the trial court, the court of appeals rejected Plan's argument that its transaction with Chen was excluded from Article 9. *Id.* at 881, 456 S.E.2d at 241. The court concluded that this transaction did not involve the "creation" or "transfer" of an interest in real estate, but instead involved the "pledge of collateral or 'lien' against negotiable instruments." *Id.* The court explained that a "pledge creates a lien on the property by the pledgee while legal title remains in the pledgor." *Id.* Simply stated, "possession passes, but not title." *Id.* As to the transfer and assignment that Chen executed, the court analyzed the documents which were executed and concluded that these acts were done so that Plan could hold the security deed and note as security for the loan. *Id.* Furthermore, "title to these instruments never vested in Profit ... [therefore,] [Plan] only acquired a lien against the commercial paper, i.e., the security deed and note." *Id.* Accordingly, the court held that Article 9 of the Georgia Commercial Code was applicable to the transaction. *Id.*

*Chen* is consistent with the vast majority cases and commentators who have dealt with this issue. *See Fogler v. Casa Grande Cotton Finance Co. (In re Allen)*, 134 B.R. 373 (9th Cir. BAP 1991); *Ryan v. Zinker (In re Sprint Mortgage Bankers Corp.)*, 177 B.R. 4 (E.D.N.Y.1995); *First National Bank of Boston v. Larson (In re*

*Kennedy Mortgage Company)*, 17 B.R. 957 (Bankr.D.N.J.1982); *Army National Bank v. Equity Developers, Inc.*, 245 Kan. 3, 774 P.2d 919 (1989); *Rodney v. Arizona Bank*, 172 Ariz. 221, 836 P.2d 434 (1992); 4 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 30–7 at 45–49 (4th ed.1995); Jan Z. Krasnowiecki, et al., *The Kennedy Mortgage Co. Case: New Light Shed on the Position of Mortgage Warehousing Banks*, 56 Am. Bankr. L.J. 325 (1982).

Most of the above authorities base their reasoning on UCC § 9–102(3) and Official Comment 4 to that subsection which makes Article 9 applicable to "realty paper." *See e.g., In re Allen*, 134 B.R. at 375; White & Summers, *supra*, § 30–7 at 45. In pertinent part, Official Comment 4 provides:

> [T]he owner of Blackacre borrows $10,000 from his neighbor and secures his note by a mortgage on Blackacre. [Article 9] is not applicable to the creation of the real estate mortgage. However, when the mortgagee in turn pledges this note and mortgage to secure his own obligation to X, [Article 9] is applicable to the security interest thus created in the note.[4]

In following Comment 4 to UCC § 9–102(3), courts generally have concluded that Article 9 governs perfection in a note secured by a real estate mortgage and that no action needs to be taken with regard to the mortgage; it is best "to concentrate on the note." *Allen*, 134 B.R. at 375; *see also Rodney*, 172 Ariz. at 223, 836 P.2d at 436 (holding "that a debt for purchase of real property (and the promissory note that is evidence of that debt) cannot be separated

from the mortgage (or deed of trust) securing that debt.").

However, the analysis does not end there. The court agrees with the commentators that in analyzing this issue, one must recognize that the parties to these types of transactions live in two separate worlds; the "mortgagor's world" and the "mortgagee's world." *See* Krasnowiecki, *supra*, at 334. As Krasnowiecki explains:

> [A]t one end are the interests of the *mortgagor in the land* and those who take *interests in the land* from the mortgagor. At the other, the interests of the *mortgagee* are evidenced by the *note and the mortgage . . . .* At the mortgagor's end, the land can be sold subject to the mortgage (or with assumption of the mortgage), or the mortgagor may pay off the mortgage and secure a satisfaction of record and then either keep the land or sell it. . . . At the mortgagee's end, the mortgagee . . . may sell the mortgage and note outright to someone else or he may pledge it as a security for [a] loan . . . ."

Krasnowiecki, *supra*, at 334. White & Summers have adopted Professor Krasnowiecki's view. *See* White & Summers, *supra*, § 30–7 at 46.

The primary case upon which Krasnowiecki bases his position is the case of *In re Kennedy Mortgage Company*, 17 B.R. at 957. Kennedy's principal activity involved originating loans to mortgage applicants. In addition to lending its own money to these mortgage applicants, Kennedy loaned funds that it obtained from various lenders. These funds were in the form of "warehousing" lines of credit. One such lender was First National Bank of Boston

**4.** The court notes that Georgia, unlike many other states, has not adopted the Official Comments to the UCC. However, because O.C.G.A. § 11–9–102(3) was adopted verbatim from UCC § 102(3), due consideration is to be given to the official comments. *See Roswell Bank v. Atlanta Utility Works, Inc.*, 149 Ga.App. 660, 255 S.E.2d 124 (1979); *Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.*, 120 Ga.App. 578, 171 S.E.2d 643 (1969).

("FNBB"). In exchange for the warehousing line of credit from FNBB, Kennedy executed assignments of mortgages to FNBB which were delivered to FNBB along with the corresponding promissory notes. FNBB failed to record the assignments. *Id.* at 958–59.

Because the notes were negotiable instruments which are perfected by possession, the court held that FNBB was perfected by taking possession. *Id.* at 965. Moreover, the court concluded that FNBB's failure to record the assignments were not fatal to FNBB's perfection. *Id.* The court explained that "FNBB has a perfected lien on the note and the mortgage is only collateral to the note. The mortgage without the debt is of no effect." *Id.*

The court in *Kennedy* also addressed the second sentence of Official Comment 4 to UCC § 9–102(3) which reads, "[t]his Article leaves to other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or the recording or non-recording of the mortgagee's interest." The court explained that the "other law" refers to the real estate recording laws which exist to "establish priorities and rights of individuals who are affected by the chain of title or encumbrances on the real estate." *Id.* at 964. In other words, the "other law" protects those in the "mortgagor's world." *See* White & Summers, *supra,* § 30–7 at 48. The court noted that under New Jersey real estate recording laws, mortgages and assignments of mortgages *may* be recorded. *Kennedy* at 964. However, merely because the real estate recording laws provide that assignments *may* be recorded, "this fact does not affect the validity of an assignment of a mortgage which has not been recorded." *Id.*

Adopting the *Kennedy* approach as well as Krasnowiecki's analysis, the Kansas supreme court in *Army National Bank* concluded that the recording statutes were intended to protect the mortgagor and those dealing with the underlying land. 245 Kan. at 15, 774 P.2d at 928.

In *Army National Bank,* Equibank acquired nine notes which were secured by nine corresponding mortgages on real property. In exchange for a loan from the Bank of Kansas City ("BOKC"), Equibank pledged the nine notes to BOKC and assigned the nine mortgages to BOKC. Because BOKC was a creditor of the mortgagee, not a creditor of the mortgagor, the court held that perfection could be effected only by possession of the notes. *Id.* at 19, 774 P.2d at 930. If BOKC had been the creditor of the mortgagor, the court noted that BOKC would have been required to record the mortgage in order to have been perfected. *Id.* The court explained that this approach is consistent with the purposes of the recording acts, which is to protect the interests of the mortgagor. *Id.*

The court notes the case of *Peoples Bank of Polk County v. McDonald (In re Maryville Savings & Loan),* 743 F.2d 413 (6th Cir.1984), *clarified on reconsideration,* 760 F.2d 119 (1985). In this case, Peoples Bank loaned money to Maryville. As collateral for this loan, Maryville assigned a mortgage and note to Peoples Bank. Peoples Bank recorded the assignment, but failed to take possession of the note. The bankruptcy court concluded that Peoples Bank did not perfect its interest. *In re Maryville,* 27 B.R. 701, 709 (Bankr.E.D.Tenn.1983). The district court, however, reversed the bankruptcy court and held that since the recording was accomplished, this was sufficient for perfection under Tennessee law. *In re Maryville,* 31 B.R. 597, 599 (E.D.Tenn. 1983).

Affirming in part and reversing in part, the Sixth Circuit split the perfection of the mortgage from the perfection of the note. *Maryville,* 743 F.2d at 415–16 (6th Cir. 1984). The court concluded that Article 9 applied to Peoples Bank's interest in the promissory notes and, because it failed to take possession of the notes, Peoples Bank's security interest in the notes was unperfected. *Id.* at 416–17. The court further concluded, however, that Article 9 did not apply to Peoples Bank's interest in the mortgage. Therefore, because the assignments were properly recorded, Peoples Bank was perfected as to the mortgage. *Id.* at 417.

After the court's ruling, the bankruptcy trustee received funds from "non-foreclosure sources." In an attempt to clarify how these funds were to be handled, the trustee moved for reconsideration. *Maryville,* 760 F.2d 119, 120 (6th Cir.1985). In a supplemental opinion, the court found that the funds paid to the trustee were proceeds of the notes. *Id.* at 121. Because Peoples Bank failed to perfect its interest in the notes, the court held that the trustee must prevail. *Id.* The court noted that the result "might be to the contrary" if the funds were foreclosure funds stemming from the mortgage, an interest in which Peoples Bank was perfected. *Id.*

A great deal of the majority line of cases are critical of the result in *Maryville.* *See, e.g., Allen,* 134 B.R. at 375 (concluding that the result in *Maryville* "produces the worst of both worlds...."); *Army National Bank,* 245 Kan. at 18, 774 P.2d at 929–30 (reasoning that "a mortgage cannot exist separately from the note it secures."). In *Army National Bank,* the court ex-

plained that splitting the perfection of the note and the mortgage could create a situation whereby two separate parties are simultaneously and respectively perfected in the note and the mortgage. *Id.* This situation, in turn, may result in the respective parties having a "note absent its security or a mortgage which may be worthless." *Id.*

White and Summers also criticize *Maryville.* *See* White & Summers, *supra,* § 30–7 at 49. They propose that splitting the perfection of the note and mortgage would effectively require the mortgagor to pay twice to get free and clear title to his real property. *Id.*

The court agrees with the reasoning of the majority line of cases and commentators. In applying that reasoning to the facts of this case, the court must first determine whether the transaction occurred in "mortgagor's world" or the "mortgagee's world."

As to the transactions between SGE and the investor entities, the court finds that these transactions occurred in the world of SGE, the "mortgagee's world." Similar to the majority line of cases, SGE pledged the mortgages and notes as collateral for SGE's own obligation to the investors. Although the assignments of the mortgages and the Investor Contract described the property and the individual borrower, the court nevertheless finds that the transaction occurred in SGE's world.

At oral arguments, however, "Group C"[5] of the individual investors addressed this very point. Given the fact that the Investor Contract identifies a specific borrower and a specific tract of land, Group C argues that each investor intended to fund

---

5. Due to the vast number of individual investors in this adversary proceeding, they have been designated either group "A", "B", or "C" in the court docketing system. "Group

C" consists of approximately 26 individual investor entities which are represented by the law firm of Sims, Fleming & Spurlin, P.C.

a particular loan, thereby taking an interest in a particular parcel of real property. Furthermore, SGE was to return their money to them if the loan to the individual borrower failed to close. Group C argues that these facts distinguishes them from the majority line of cases.

The court acknowledges that these distinctions do not seem to be addressed by any of the cases. For example, in *Chen,* the underlying real estate transaction between Chen and Blankenship already had been consummated before Chen pledged the note to Profit. Therefore, unlike the investors' loan to SGE, Profit's loan to Chen was not contingent on whether Chen's loan to Blankenship closed. Likewise in *Sprint Mortgage,* there was no attempt by the debtor/mortgagee to earmark the specific loans made to the mortgagee to the specific mortgages that the debtor assigned. Group C argues that these factual differences are sufficient to distinguish them from the majority line of cases.

■ Although these are meritorious distinctions, the court finds that, at all times, the investors' interest was a money investment interest. The language of the Investor Contract is clear: "[t]he loan documents . . . shall be considered as collateral or security for *only for repayment of the debt* owed by [SGE] to [the investor]." (Doc. # 559, Exh. "A" at ¶ 5) (emphasis added). At all times, the investors were dealing with SGE and never took an *"interest[ ] in the land from the mortgagor."* See *Krasnowiecki, supra,* at 334. Therefore, the court finds that SGE's assignment to the investors did not a create or transfer an "interest in or lien on real estate . . . ." O.C.G.A. § 11–9–104(h).

■ The fact that the assignments were or were not recorded has no bearing on perfection. *See Kennedy* at 964. The Mills argue, however, that O.C.G.A.

§ 44–14–60 is specific authority governing the transfer of security deeds. They assert that this code section "fully anticipates that an assignment should be recorded." (Mills' Mem. In Opp'n, Doc. # 617). The court agrees with the Mills that § 44–14–60 provides the manner in which the assignment of a security deeds *may* be recorded. However, as the court in *Kennedy* recognized, "[t]he fact that [the recording statutes provide that] assignments of mortgages *may* be recorded does affect the validity of an assignment of a mortgage which has not been recorded." *Kennedy* at 964 (emphasis added). The purpose and intent of the recording statutes are to protect those in the "mortgagor's world." *See, e.g., Army National Bank* at 19, 774 P.2d 919. These transactions occurred in the "mortgagee's world" which is outside the scope which § 44–14–60 is intended to protect. Accordingly, the court rejects the Mills' argument.

The court finds that Article 9 of the Georgia UCC applies to the transactions between SGE and the investor entities. As a result, the investor entities are perfected only to the extent to which they have possession of promissory notes.

The court notes that because of the fraudulent conduct of the prepetition debtor, very few if any of the investor entities are in possession of the original promissory notes. Therefore, the court realizes that this is an unfortunate result for the investor entities. However, the court must apply the law based on the facts which are presented.

■ The court finds that Article 9 also applies to the transactions between SGE and the Associates. Like the transactions with investor entities, the transactions between SGE and the Associates occurred in the "mortgagee's world." Although the notes were purchased by the Associates

and not pledged to them like the investors, this distinction is immaterial. In addition to pledging a mortgage and note, transactions within the mortgagee's world includes "sell[ing] the mortgage and note outright...." *See Krasnowiecki, supra*, at 334.

The court now turns the issue of whether of the Associates are holders in due course of the promissory notes which they purchased from SGE. Pursuant to O.C.G.A. § 11–3–302: [6]

(1) A holder in due course is a holder who takes the instrument:

(a) For value; and

(b) In good faith; and

(c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

O.C.G.A. § 11–3–302(1).

■ A "[h]older [is defined as] a person who is in possession of a document of title or an instrument ...." O.C.G.A. 11–1–201(20).[7] Therefore, to the extent that the Associates are in possession of the notes which they purchased from SGE, the court finds that the Associates are "holders" as defined under Georgia law. The court will now examine the three other requirements under § 11–3–302(1).

A holder takes an instrument for value "[t]o the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process...." O.C.G.A. § 11–3–303(a).

■ A holder must also take the instrument in good faith. O.C.G.A. § 11–3–302(1)(b). Good faith is defined as "hones-

ty in fact in the conduct or transaction concerned." O.C.G.A. § 11–1–201(19). To constitute bad faith, a purchaser must have acquired the instrument "with actual knowledge of its infirmity or with a belief based on the facts or circumstances as known to [the purchaser] that there was a defense or [the purchaser] must have acted dishonestly." *Citizens & Southern Nat'l Bank v. Johnson*, 214 Ga. 229, 231, 104 S.E.2d 123, 126 (1958); *Commercial Credit Equipment Corp. v. Reeves*, 110 Ga.App. 701, 704, 139 S.E.2d 784, 787 (1964).

Lastly, a holder must take the instrument without notice of default or defense. O.C.G.A. § 11–3–302(1)(c).

A person has "notice" of a fact when:

(a) He has actual notice of it; or

(b) He has received a notice or notification of it; or

(c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.

O.C.G.A. § 11–1–201(25). *See also Hopkins v. Kemp Motor Sales, Inc.*, 139 Ga. App. 471, 473, 228 S.E.2d 607, 609 (1976) (holding that knowledge of a fact as defined in the UCC is actual knowledge).

In this case, the Associates, the Committee, and several of the investor entities have stipulated that the Associates collectively paid SGE approximately $5.36 million for approximately 306 loans. (Doc. # 559 at ¶¶ 23–25). Therefore, the court finds that the Associates took the notes for value.

---

**6.** This is the former version of § 11–3–302 as it read prior to July 1, 1996. Because all transactions in question took place prior to July 1, 1996, the pre–1996 version is the applicable law. *See Choo Choo Tire Service, Inc.*

*v. Union Planters Nat'l Bank*, 231 Ga.App. 346, 498 S.E.2d 799 (1998).

**7.** *See supra* note 6.

■ As to good faith and notice, these issues are not quite as clear. Along with their brief in support of their original motion for partial summary judgment, the Associates filed affidavits executed by Michelle A. Bryan, Marilyn D. Britwar, Kathleen A. Timkin, and Kathleen A. Larson. (Doc. # 449, Exhs. "A" & "C"–"E"). Among other things, these affidavits attested to the Associates' good faith and lack of notice that the notes which they purchased from SGE were subject to other claims.

However, because these affidavits were not originals, but were copies of affidavits submitted in another court action, SGE objected to their being part of the record. On May 17, 2001, the court entered an order sustaining SGE's objection and disallowing the affidavits. (Doc. # 532). Remarkably, other than these disallowed affidavits, the Associates never filed any supporting documentation attesting to their good faith and lack of notice. Furthermore, in the Committee's response to the Associates' original motion, the Committee submitted affidavits executed by Sanford A. Cohn and Kevin B. Buice.[8] (Doc. # 489, Exhs. "A" & "B"). These affidavits attest to a lack of good faith and notice on behalf of the Associates in their purchase of the notes from SGE. Although SGE did not submit any evidence, SGE asserts that issues of material fact exist as to good faith and notice. (Doc. # 604 at pp. 3).

The court agrees with SGE and finds that issues of material fact do exist as to good faith and notice. Under Federal Rule of Civil Procedure 56, the moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991) (holding that the moving party has the burden of establishing its right of summary judgment). In this case, the Associates have failed to carry their burden. Therefore, the court finds that issues of material fact exist as to whether the Associates took the notes which they purchased from SGE in good faith and without notice of default or defense.

The court will render a separate memorandum opinion on SGE's motion for summary judgment.

### CONCLUSION

The UCC is the applicable law to the transactions between the Associates, the investor entities, and SGE. None of these transactions involved the creation of an interest in real estate. Therefore, the court will grant the Associates' motion for partial summary judgment as to that issue only. Regarding the issue of whether the Associates are holders in due course of the notes which they purchased from SGE, the court finds that issues of material fact exist as to the elements of good faith and notice. The court will deny the Committee's motion for partial summary judgment.

An order in accordance with this Memorandum Opinion will be entered.

---

**8.** The court notes that Affiant Sanford A. Cohn is an investor/claimant in this case and Affiant Kevin B. Buice is an attorney of record for numerous parties in interest. (*See* Exh. "A" at ¶ 11; Exh. "B" at ¶ 2).